1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2
     UNITED STATES OF AMERICA,        . Docket No. CR-08-0302 (PLF)
 3                                     .
          Plaintiff,                   .
 4                                     . Washington, D.C.
              v.                       . January 5, 2009
 5                                     . 9:00 a.m.
     SHAWN BERTRAM ARMSTEAD,           .
 6                                     .
          Defendant.                   .
 7   . . . . . . . . . . . . . . . . .

 8                      TRANSCRIPT OF SENTENCING
                 BEFORE THE HONORABLE PAUL L. FRIEDMAN
 9                  UNITED STATES DISTRICT JUDGE

10   APPEARANCES:

11   For the Plaintiff:        United States Attorney's Office
                               By: Jonathan W. Haray, Esquire
12                             555 4th Street, Northwest
                               Washington, D.C. 20001
13

14   For the Defendant:        Federal Public Defender's Office
                               By: Lara G. Quint, Esquire
15                             625 Indiana Avenue, Northwest
                               Washington, D.C. 20004
16

17   Court Reporter:           Linda L. Russo, RPR
                               Official Court Reporter
18                             Room 6403, U.S. Courthouse
                               Washington, D.C. 20001
19                             202.354.3244

20

21

22

23

24

25   Proceedings reported by machine shorthand, transcript produced
     by computer-aided transcription
```

1                    P R O C E E D I N G S

2          THE CLERK:  Criminal 08-0302, United States of

3   America versus Shawn Bertram Armstead.  For the government, Mr.

4   Haray.  For the defendant, Ms. Quint.

5          THE COURT:  Good morning, everybody.  We're here for

6   sentencing of Mr. Armstead.  I have the presentence

7   investigation report prepared by Ms. Moses-Gregory, the

8   defendant's memorandum in aid of sentencing, the government's

9   memorandum in aid of sentencing, and obviously the plea papers,

10  and so forth.  And then this morning I received two letters,

11  one from Mr. Armstead's sister, Katura Soloman (phonetic), and

12  one from a former co-worker, Mr. Leo Eyombo, E-y-o-m-b-o.  I

13  assume that you have received those as well.

14         MR. HARAY:  Not yet, Your Honor.  I think they came

15  in at the last moment.

16         MS. QUINT:  Your Honor, as I explained to Mr. Haray

17  and Ms. Moon, our systems are completely down at the Federal

18  Defenders' Office, so I received over the weekend those two

19  letters on my Blackberry but couldn't print them.  So the only

20  thing I could think to do at the last minute this morning was

21  forward them to Ms. Moon to print them out.  So Mr. Haray has

22  not seen them.

23         THE COURT:  Do you want to see them?

24         MR. HARAY:  Yes, thank you.

25         (There was a pause in the proceedings.)

```
1              MS. QUINT:  In addition, Your Honor, Mr. Armstead
2     just passed up a third letter from his nephew that's very
3     brief, and I'll pass it up.
4              THE COURT:  Why don't you let Mr. Haray read all
5     three of them, and then you can give them back to me.  And I
6     also have a report from Pretrial, which I assume you both have
7     received as well.
8              MR. HARAY:  That's right.
9              THE COURT:  Thank you.  I have the three letters, I
10    also have the receipts and acknowledgments.  And the government
11    says there are no material factual inaccuracies, and the
12    defense says there are material factual inaccuracies.  And I
13    guess my question, Ms. Quint, is, I know there's a legal
14    question that you described in this letter and you've also
15    described in your filing with me, are there any factual errors
16    that need to be corrected?
17             MS. QUINT:  No, Your Honor.
18             THE COURT:  Let's talk about the legal issue.
19    Basically, the question is that this particular offense,
20    receipt of a bribe by a public official, in violation of 18
21    United States Code, Section 201(b)(2) A and C, is governed by
22    Sentencing Guideline 2C1.1, and the base offense level is 14.
23    And there is a two level upward adjustment under 2C1.1(b)(1)
24    because the offense involved more than one bribe.  And I don't
25    think Ms. Quint is arguing about that.
```

1          And then the question really relates to 2C1.1(b)(3),

2   which says if the offense involved an elected public official

3   or any public official in a high level decision-making or

4   sensitive position, increase by four levels.

5          If that applies, that would get us to a level 20.  If

6   it doesn't apply, it gets us to a level 16.  In either case

7   there's a three level downward adjustment for Mr. Armstead's

8   acceptance of responsibility by pleading guilty.

9          If the upward enhancement does apply, we then are at

10  a level 17, criminal history category one, because he has no

11  prior record.  If it doesn't apply, we are at a level 13,

12  criminal history one.  In the first instance it's 24 to 30

13  months, in the second instance it's 12 to 18 months.  So is

14  that sort of where we are?

15          MS. QUINT:  Yes, Your Honor.

16          THE COURT:  So what do you want to say about this

17  guideline?

18          MS. QUINT:  Your Honor, largely because of my voice,

19  I'm going to rely for the most part on the memorandum I filed

20  on Mr. Armstead's behalf.  I guess it really depends on whether

21  the Court sees the enhancement as -- the Commentary to the

22  enhancement provides as an example a law enforcement officer.

23  I guess for me the question is, does that mean any law

24  enforcement officer, or is that an example of someone who might

25  often fall into this category?

1            When one looks at the definition provided in the

2    Commentary, I just did not see that the government had met its

3    burden in any way proving that Mr. Armstead held a position

4    characterized by direct authority, to make decisions for or on

5    behalf of a government, department, agency or their entity, or

6    by substantial influence over the decision-making.

7            Based on my understanding, if anything, and as stated

8    in the presentence report, he really was executing other

9    people's higher up in the agency, their policies.  He did have

10   arrest responsibilities, and he had the right to make arrests,

11   but he was not deciding which violations on school grounds

12   would be violations that would be subject to arrest.

13           So our position is that the government just has not

14   proven that Mr. Armstead had a delicate decision-making role,

15   that he promulgated any of the policies that were followed by

16   the police department responsible for enforcing regulations on

17   the school grounds.

18           And that the cases, while the case law is fairly

19   minimal, there seem to be certain factors the Courts, when

20   imposing this enhancement, would say, would give specific

21   examples of access to information that these individuals had,

22   or any decision-making authority.

23           I just don't see anywhere in the record here or in

24   the papers filed by the government any examples of the kind of

25   sensitive decision-making that Mr. Armstead would have made in

1   his position.

2          THE COURT:  Here's what I think the problem is.  The

3   guideline itself says someone in a high level decision-making

4   or sensitive position.  So you can be a high level

5   decision-maker, or you can be in a sensitive position.  They're

6   two separate things.  And under Application Note Four, the

7   examples part of it, 4(b) seems to recognize that they're two

8   separate things.

9          The problem is in the definition section where they

10  tried to define it all in one fell swoop.  And I suppose now

11  that I'm focusing on this, if I were rewriting this I would

12  have two separate definitions because I think the guideline

13  itself is written to make them two separate things, but the

14  definition in the Application Note is not so written.  And the

15  examples are as if they were two separate things.

16         So I guess I have to decide, unless you disagree.

17  The government's best argument is the language of the guideline

18  and the language of 4(b).  Your best argument is the definition

19  section 4(a).  And it's not clear, and when I get done here,

20  I'll send an e-mail to the Sentencing Commission telling them

21  they should rewrite 4(a).

22         MS. QUINT:  I think the Court is right as to where

23  our positions are, and I agree that it's confusing.

24         MR. HARAY:  Your Honor, I don't believe that the

25  definition section under 4(a) really leaves much room for the

1   defendant to argue that he's not in a sensitive position.  I

2   understand and I agree with the Court's point, that it probably

3   would be more specific if they made two different definitions

4   for those two different categories.  But if you apply the

5   single definition as written, which includes positions

6   characterized by a direct authority to make decisions for or on

7   behalf of a government, department or agency, law enforcement

8   officers fit that definition.

9           I think that you can distinguish high level

10  decision-makers, which would be usually, in most cases would be

11  more senior government officials, but police officers or law

12  enforcement officers do have direct authority to make decisions

13  on behalf of the agency they represent.

14          And I think that even if we just limit it to the fact

15  that in this case the defendant had the authority to make

16  arrests, that is an awesome responsibility that takes place

17  without oversight.  At least no immediate oversight.  And I

18  don't think it's much consolation to people who get wrongfully

19  arrested that there's oversight somewhere down the road.

20          There's really, as far as I see it, there's no real

21  factual dispute about what his powers were, and that in every

22  respect they were the same as any other law enforcement

23  officer, although DCPS has a more limited jurisdiction than

24  let's say the entire Metropolitan Police Department or any

25  federal law enforcement agency.  But there's no dispute that he

1    wore a law enforcement uniform, he had a badge, he carried a

2    firearm, he could make arrests, he could use deadly force.  And

3    obviously those are instances when in many times there is no

4    review at all.

5          One of the letters that Mr. Armstead presented on his

6    behalf I think demonstrates many of the critical situations

7    that he was sometimes faced with dealing with.  Responding to

8    shootings, responding to burglaries, those are instances where

9    he could make life or death decisions about suspects in the

10   most serious case, and in the less serious case making arrests

11   or not making arrests.  And as this case demonstrates, he was

12   making the decision not to arrest someone who perhaps should

13   have been arrested, or a report should have been filed, and

14   that's the kind of decision making that I think the definition

15   calls for.

16         I think the defense's argument seems to suggest that

17   the decision-making we're talking about under this guideline

18   talks about policy decision-making.  He didn't have policy

19   decision-making, that's true, but he had decision-making,

20   direct authority for decision-making on behalf of his agency.

21   And that's why we think he fits that definition.  And he

22   clearly meets the examples that are provided by the Sentencing

23   Commission.

24         THE COURT:  Anything else, Ms. Quint?

25         MS. QUINT:  Your Honor, the only thing I would add to

1    that is that this whole provision deals with a public official

2    receiving bribes, and so I would submit that the line between

3    public officials who have sensitive positions and those who

4    don't may be thin if we're defining a sensitive position as the

5    ability to act on behalf of an agency.  It would seem to me

6    that the majority of public officials who this whole guideline

7    applies to would have the ability to act on behalf of their

8    agency.  And because he's being sentenced as a public official

9    having accepted a bribe, that is already encompassed in the

10   fact that his sentence will be higher than another individual

11   charged with theft related offenses for the same amount of

12   loss.

13           So there is a concern about double counting, perhaps,

14   and I'm not sure where the line would be between public

15   officials who do hold sensitive positions and those who don't.

16           THE COURT:  Well, I understand your point, but the

17   examples are helpful.  If somebody is working in the D.C. Tax

18   Office, for example, and is a low level member of a conspiracy

19   and doesn't have the authority on his or her own to give

20   somebody a tax refund but can sign checks or can check a box,

21   or whatever, and they're doing so at the behest of somebody

22   higher up who does have the decision-making authority, that

23   person would not get the four level bump up, whereas the person

24   directing him or her would.

25           And what do we mean by sensitive position?  Well, a

1    sensitive position, obviously somebody like a CIA officer, a

2    CIA person, even somebody who doesn't have high level

3    decision-making authority would be in a sensitive position.

4         But let me say first that I think that the guideline

5    itself, 2C1.1(b)(3) makes a distinction between public

6    officials in high level decision-making positions versus public

7    officials in sensitive positions.  And you don't have to be in

8    a high level decision-making position to be in a sensitive

9    position.  They can be separate things.

10        The definition under Application Note Four sort of

11   muddies the waters a little bit, but suggests that if you have

12   direct authority to make decisions for or on behalf of a

13   government, department or agency, or substantial influence over

14   the decision-making process that you fall within either or both

15   of these things.

16        The examples are helpful because somebody like me and

17   somebody like Mr. Haray, by example of a judge or prosecuting

18   attorney, are in high level decision-make positions, whereas

19   the next sentence says somebody who may not be in a high level

20   decision-making position but in a sensitive position includes a

21   juror or a law enforcement officer.

22        Now, Mr. Armstead was a law enforcement officer.

23   It's clear that a special police officer has a lot of the same

24   powers as a Metropolitan Police Department officer or a Capitol

25   Police officer or Park Police officer.  He's permitted by

1    statute to carry a weapon, to make arrests, and the like.  And

2    that to me is what was intended by this guideline, someone

3    being in a sensitive position.

4            And I also agree with Mr. Haray that the phrase "high

5    level decision-making" does not necessarily mean policy

6    decisions.  It can be other kinds of important decisions, and

7    making arrests are those kinds of important decisions.  The

8    decision whether to arrest somebody, the decision whether to

9    handcuff somebody, whether to point a gun at somebody, are the

10   kinds of decisions that I think were encompassed.

11           The cases that you cite, both sides cite, the Estrada

12   case talks about a law enforcement officer being a person in a

13   sensitive position.

14           So I guess for me the bottom line is that he was in a

15   sensitive position as defined by the guideline, and meets one

16   of the specific examples of sensitive position given in the

17   Commentary, a law enforcement officer.

18           And, in addition, he had decision-making authority

19   that was significant, the decision to arrest somebody or not to

20   arrest somebody I think meets the test.

21           I do think that Application Note 4(a) could be

22   clarified, but the guideline itself, 2C1.1(b)(3), is pretty

23   clear on its face that this is at least a sensitive position as

24   amplified by the examples in Application Note 4(b).

25           So that's where I am, and it's a good issue on appeal

1    if you want to take an appeal.

2            So that having been said, the base offense level is

3    14.  There's a two level upward adjustment under 2C1.1(b)(1),

4    getting us to a level 16.  And then a four point adjustment

5    under 2C1.1(b)(3) for the reasons I have just stated, which

6    gets us to a level 20.  A three level downward adjustment under

7    3E1.1, to a level 17.  Mr. Armstead has no prior arrests,

8    adjudications, convictions.

9            So at a level 17, criminal history category one,

10   that's 24 to 30 months.

11           And so I know you disagree with my inclusion of the

12   four point upward adjustment, but other than that, does either

13   counsel have any disagreement with the way I'm reading the

14   guidelines?

15           MR. HARAY:  No, Your Honor.

16           MS. QUINT:  No, Your Honor.

17           THE COURT:  So then the question is under 3553(a)

18   what the appropriate sentence is.  Should it be a sentence

19   within the guideline range of 24 to 30 months?  And I think the

20   government's position is that it should be, and that they

21   recommend the low end of the guidelines.  And the defense's

22   position obviously is that it shouldn't be.

23           So do you want to speak first, Ms. Quint, despite

24   your laryngitis?

25           MS. QUINT:  Sure.  I would note for the Court, Mr.

1  Armstead would like to address the Court if possible, and his

2  older sister Paula is also here, and she has asked if she can

3  address the Court also.

4          Your Honor, as the Court noted and as I requested in

5  my sentencing memorandum, we are asking for a sentence of

6  probation to incorporate a period of home detention and

7  whatever other community service or other conditions the Court

8  may deem appropriate in this case.

9          Given Mr. Armstead's complete lack of criminal

10 history and the fact that he's never spent a day, even in this

11 case a day incarcerated, probation and electronic monitoring

12 would definitely serve as punishment for him.  At the same

13 time, that punishment would not be disproportionate, would not

14 be more than sufficient to fit the crime at issue here.

15         As the letter from Mr. Armstead's older sister

16 indicates, and I think the presentence report shed some light

17 on as well, this case has brought great shame to Mr. Armstead.

18 I'm not sure if the Court is aware, but certainly at all the

19 initial hearings the media was present.  He did have a role

20 within the D.C. Public Schools.

21         The fact that he's been involved for the first time

22 in the criminal justice system and in this capacity has really

23 embarrassed him, embarrassed his family, and brought shame to

24 him.  That shame cannot be quantifiable in terms of a number of

25 months, I understand that, but I do think it goes into the

1    Court's factoring of how much punishment he's already faced,

2    and how much he will continue to face that really has nothing

3    to do with the number of months he receives.

4            In terms of the offense itself, while there's no

5    excuse for what Mr. Armstead did, I do think the monetary

6    amount, the fact that it was under a thousand dollars is

7    relevant, and I also think that the fact that he didn't go out

8    and go on a shopping binge or spend the money on luxury goods

9    is important.

10           I'm sure the Court -- I've had clients who've done

11   this, I'm sure the Court has faced defendants before who have

12   really used their ill-gotten gains to go out on spending sprees

13   and spend the money to really enrich themselves personally.

14   There's no indication, in fact the presentence report states

15   that his house is very modest, there's no indication that Mr.

16   Armstead did that.

17           We know from his background, from his sister's

18   letter, that his mother had very sudden medical issues that

19   were quite dire, and Mr. Armstead did use that money, and

20   continues to the extent he can, to help his mother pay her

21   medical bills.  Again, it's not an excuse, but I think it

22   should go into factoring Mr. Armstead's sentence.

23           As far as rehabilitation goes, I'm not sure there's a

24   great rehabilitative purpose to be served by sentencing.  Since

25   the time he was 16 and in fact left school early, Mr. Armstead

1    has been a productive member of society.  He's been

2    consistently employed.  We know that in addition to having

3    steady responsible employment, he's been an excellent son to

4    his mother, and clearly an excellent brother to his sisters.

5    He's really held his family together, which partly explains why

6    they were so shocked and dismayed by this case.  He's had to be

7    the strong one in many ways.

8            He has not been living in D.C.  He's not led a life

9    in the streets.  And, if anything, a period of incarceration

10   would bring him into contact with people who until now he's

11   actually stayed away from.  He, at least until recently, he was

12   living out in Maryland, and I believe his intent is to continue

13   living there.  So I'm not sure what purpose in terms of

14   training or rehabilitation a sentence of incarceration could

15   actually provide, and I am a little bit worried about the

16   countereffects that it could have.

17           I do think home detention will be a constant reminder

18   to him, as will just checking in with probation, of the shame

19   he's brought his family and of the fact that he got himself

20   into this situation.  At his age, he's never even been arrested

21   before.  So it's very unfortunate.  I know he really deeply

22   regrets his mistake, and would like to personally address the

23   Court about that.

24           THE COURT:  Do you want to speak next or should we

25   hear from others, Mr. Haray?

1          MR. HARAY:  Whatever the Court prefers.

2          THE COURT:  Why don't you go ahead.

3          MR. HARAY:  Yes, sir.  Your Honor, members of law

4    enforcement are the most public face of the entire criminal

5    justice system.  And I think that we can't really dispute that.

6    Most people in our community, our society, won't be in a

7    courtroom like this ever in their lives, except maybe on jury

8    duty.

9          But almost everybody has contact at some point or

10   another with members of law enforcement.  And when people who

11   are in the position that the defendant was in, having taken a

12   sworn oath to enforce the law, to uphold the laws of our

13   community, to protect and to serve its citizens, when people,

14   when officers in that position abuse their trust, it has

15   widespread -- it causes widespread harm to the entire criminal

16   justice system.

17         So I think it's unfair to look at this case solely in

18   terms of what's best or not best for the defendant.  I know

19   that there are obviously factors the Court must consider that

20   are influenced by what's good for him, but the Court also has

21   to consider the important goals of deterrence in the community.

22   Deterrence not only -- well, deterrence in this case I think is

23   how this will affect other people in the position that the

24   defendant was in.

25         Because one thing about members of law enforcement is

1    that because they have so much power, because they don't have
2    as much oversight in the field as other positions, they don't
3    work in an office with anyone looking over their shoulder, that
4    it could be easy for them to commit an offense like this
5    without other people finding out.

6            And so we ask the Court to consider the potential
7    harm that would be caused by a sentence that is too lenient.
8    General deterrence calls for, in this case, a serious
9    punishment, and we don't agree that a serious punishment in
10   this case, even considering all of the personal factors that
11   apply, would be probation.  That would be a serious, a wide
12   departure from what the sentencing guidelines call for, and in
13   this case it just wouldn't be appropriate, Your Honor.

14           Many public corruption cases, especially cases where
15   the defendant is a public official, do not involve criminal
16   histories.  The defendant wouldn't be a law enforcement officer
17   if he had had a serious criminal past.  That doesn't mean that
18   a sentence that includes incarceration is not appropriate here.
19   In fact, because of the damage that the defendant's crime has
20   caused and has the potential to cause to other law enforcement
21   officers, it is especially an appropriate sentence in this
22   case.

23           Now, I disagree with what the defense argues in terms
24   of the amount of the money that was taken in the bribe here.
25   Obviously, the sentencing guidelines do take account in some

1   instances for the bribery amount, and the sentence can go

2   higher when the bribe is a higher dollar amount, but I don't

3   think it's appropriate to say that just because the bribe

4   involves $1,000 or $1,500 that that takes away from the

5   seriousness of this offense in terms of the potential for

6   corrupting and tainting the criminal justice systems and for

7   law enforcement officers in general.

8           This is not a theft case, and it wouldn't be

9   appropriate I think to follow the defense's suggestion to

10  minimize the punishment just because the punishment would be

11  less if he had chosen to steal the money as opposed to take it

12  in a bribe.  Bribery has different factors in it that make it a

13  more serious offense and call for a more serious punishment

14  putting aside the dollar amount, and it's not the only crime

15  that's like that, obviously.  We don't treat armed robbers the

16  same as we do people who commit embezzlement because there are

17  factors about armed robbery that are just so different from

18  embezzlement that it calls for a stiffer punishment.

19          And I think in this case, while this is not an armed

20  robbery, I'm not putting it in that category, but there are

21  factors about bribery by a public official that make it unlike

22  theft or embezzlement or other financial crimes, and because of

23  those differences it calls for a more serious punishment.

24          The government doesn't dispute some of the personal

25  factors that the defendant has put forward about his family

1    relationships, his background and up-bringing, but to put it

2    simply, Your Honor, those we think get this case to a case at

3    the bottom of the guidelines, 24 months.  And that's where we

4    also find -- well let me restate that.

5            A sentence of 24 months would not only account for

6    the defendant's background, the favorable things that he's put

7    before the Court, his work history, but it would also reward

8    him for his decision to confess to the crimes, it would also

9    reward him for his decision to take a plea, although he did so

10   in the face of very strong evidence.  And on balance when you

11   look at all the factors, the general deterrence, specific

12   deterrence, the need to punish for an offense that was ongoing

13   over a course of several weeks, we ask the Court to impose a

14   sentence of 24 months.

15           THE COURT:  Thank you.  Ms. Quint.

16           Mr. Armstead, good morning.

17           THE DEFENDANT:  Good morning, sir.  Well, basically

18   I'm here to apologize for what I did, Your Honor.  There is no

19   excuse.  I do regret doing what I have done.  I'm truly, deeply

20   sorry for it.  I apologize to DCPS and other law enforcement,

21   and also you, Your Honor.  But the only thing I can say is I'm

22   truly sorry.  It was wrong, and I agree it was wrong.  But I

23   made a mistake.  That's all I have to say.

24           THE COURT:  Thank you.  Why don't you have a seat,

25   Mr. Armstead.

1          Good morning.

2          MS. ARMSTEAD:  Good morning.

3          THE COURT:  Could you state your full name for the

4   court reporter.

5          MS. ARMSTEAD:  Sure.  My name is Paula Armstead.

6          THE COURT:  Ms. Armstead.

7          MS. ARMSTEAD:  Good morning.  I just want to say that

8   my brother has made a mistake, but everybody makes a mistake,

9   and everybody deserves a second chance.  And to see this

10  happening to him, we are in so disbelief, that he's always been

11  the leader of our family.  Whenever we needed something, no

12  matter what it was, a picture hang up, we needed money, we

13  needed just somebody to talk, somebody to encourage us, to --

14  anything, it was always him.

15         And when my mother called me on my job, I thought she

16  was playing with me.  I'm like, ma, stop playing, come on.  We

17  always called him the square.  He's always been the black sheep

18  of the family because he was always the

19  goodie-goodie-two-shoes.  He was like always better than all of

20  us.  My mother and everybody always put him on a pedestal

21  because he was always -- he's the youngest out of all of us,

22  and everybody said, well, it should have been you, or you, or

23  you.

24         But to see him in this situation and to lock him up,

25  I don't think that's the answer.  I really don't, because he's

1    so ashamed that he embarrassed us.  He's not worried about that

2    he has to go to jail.  You know, he's worrying about us, how he

3    shamed us and let us down.

4            But like I told him, he's only human.  Everybody

5    makes mistakes.  And locking him up is not -- that's -- it's

6    only going to make the situation worse.  How is it going to

7    better him?  The system is supposed to try to help.  And I know

8    that he done wrong.  I know that he done wrong, and he knows

9    that he done wrong.  We just -- he just need a second chance,

10   and we need a second chance, you know.

11           He's like -- we were talking about how -- with this

12   over, and we're going to see if he can try to get into any

13   classes to continue in his law.  I mean, everybody make a

14   mistake.  Our family was in a financial crisis, and that's not

15   an excuse.  It's really not.  And we are trying to pitch in and

16   everything, but I guess he was feeling the pressure more than

17   we were, because we always put everything on him to do

18   everything.

19           So I just don't want you all to think that this is

20   something that will happen to him ever again.  And it won't.

21   That's guaranteed.  And I believe he would never do anything

22   like this again.  He just need a second chance to prove that.

23   And given that, you will see down the long-run when you all see

24   how well he's done.

25           THE COURT:  Thank you very much, Ms. Armstead.

1    Anybody else?

2              MS. QUINT:  No, Your Honor.

3              THE COURT:  Do you want to say anything further?

4              MR. HARAY:  No, Your Honor.

5              THE COURT:  Ms. Quint, do you want to say anything

6    further?

7              MS. QUINT:  The government alluded to this, Your

8    Honor, and I know I did in my sentencing memorandum, but I

9    neglected to say earlier, to point out again that obviously Mr.

10   Armstead immediately, he pled guilty his first time in this

11   court.  He did not even listen with me to the tapes.  He knew

12   he had done wrong, and he indicated immediately a desire to

13   accept responsibility and to plead to this case.

14             THE COURT:  Thank you.

15             MS. QUINT:  Finally, Your Honor, if the Court is

16   inclined to impose a period of incarceration, I would ask the

17   Court to consider voluntary surrender for Mr. Armstead.  He's

18   been in perfect compliance with his release conditions.

19             THE COURT:  That's the easiest question.  Mr.

20   Armstead, if you want to come up.

21             Is there anything else you'd like to say, sir?

22             THE DEFENDANT:  Not right now, Your Honor.

23             THE COURT:  Okay.  Well, I'm prepared to impose what

24   I think is an appropriate sentence.  Sentencing is not easy,

25   and it's my job to consider all of the factors that go into

1   deciding what makes the most sense.  And Mr. Haray is right,

2   it's not all about what's best for you and what's best for your

3   family.  There are a variety of things that go into a sentence.

4   Obviously, it is relevant that you have never in 37 years been

5   arrested before, charged with anything, or convicted of

6   anything, that you've been a pillar of your family, important

7   to all of them, that you've been steadily employed.

8          The letters that I read this morning speak very

9   strongly to the kind of person you are and your background as a

10  person, and how you've dealt with this situation when you were

11  arrested in dealing with the agents, are all to the positive,

12  clearly.

13         The problem is that you were in a position of public

14  trust, that you were a police officer.  There are a lot of

15  government employees who don't have the kind of authority and

16  power that a police officer has.  You use that authority to

17  permit somebody to use -- not only a police officer but a

18  police officer entrusted with the safety and well-being of

19  school children and school properties.  And apparently you did

20  your job very, very well almost all the time, and went above

21  and beyond the call of duty on a number of occasions, as it was

22  indicated in the letter I read this morning from Mr. Eyombo.

23         But these transgressions to permit the use of school

24  property in an unauthorized way and to profit from it, and to

25  let this parking enterprise at Eastern High School charge for

1    vehicles to park there in an unauthorized way, was a violation

2    of your oath of office to uphold the law, and could have

3    exposed the students or the school to people that shouldn't

4    have been there, they weren't authorized.  But beyond that, we

5    don't know.

6           The fact that it happened on several different

7    occasions.  And it's not the amount of money involved, it's

8    that you had a chance to think about it, and you went back and

9    you did it several times, July 3rd, July 29th, July 31st, and

10   August 27th.  And that you were proactive in this after a time,

11   not just reactive.

12          But what I guess I keep coming back to is that while

13   this may be in some people's view small level corruption

14   compared to some of what we sadly see, it's still police

15   corruption.  And in the view of the community, if somebody who

16   has the authority that a police officer has, is not punished,

17   it taints the perception of the honesty and integrity of police

18   officers.  It harms the criminal justice system not only by

19   undermining the honest, good efforts of most police officers,

20   but also by letting the public think that either this is

21   widespread, or that even if it isn't, that police officers are

22   treated as a special case.

23          And all of that having been said, I'm going to

24   sentence you to a period of incarceration for a period of 12

25   months and one day.  And as Ms. Quint can explain, under the

1    Bureau of Prisons system, maybe she has explained, under the

2    Bureau of Prisons system that you're entitled to earn up to 54

3    days a year for good behavior, which means that it could be

4    more like ten months.  It depends on the Bureau of Prisons.

5    That's not up to me.

6              So I'm going to commit you to the custody of the

7    Bureau of Prisons for a term of 12 months and a day on Count

8    One of this Information.  And following that, a period of 24

9    months of supervised release.

10             You also are directed to pay a special assessment of

11   $100.  I find that you do not have the ability to pay a fine,

12   and I'm not going to impose a fine.  A special assessment is

13   payable immediately to the Clerk of the Court, and if for any

14   reason you can't pay it, it will be taken out of whatever

15   earnings you have in prison, but it's $100.

16             Within 72 hours of your release from custody, you

17   shall report in person to the probation office in the district

18   to which you're released.  While on supervision, you shall not

19   possess a firearm or other dangerous weapon.  You shall not use

20   or possess an illegal controlled substance.  And you shall not

21   commit another federal, state or local crime.  You shall abide

22   by the general conditions of supervision adopted by the U.S.

23   Probation Office, as well as the following special conditions.

24             First, under federal law because this is a felony,

25   you shall submit to the collection and use of DNA

1    identification information while incarcerated in the Bureau of

2    Prisons or at the direction of the Probation Office.

3           Secondly, you shall contribute 100 hours of community

4    service during your first 12 months of supervised release as

5    directed by the Probation Office.

6           I find that there's no reason for you to be drug

7    tested periodically, so I will waive that requirement of the

8    law in your case.

9           And beyond that, is there anything else?

10          PROBATION:  Your Honor, did you waive the fine?

11          THE COURT:  I did, I said I waive the fine.

12          You have a right to appeal from this sentence.  If

13   you want to appeal, you must do so within ten days from today

14   otherwise you lose the right to appeal.  Tell Ms. Quint that

15   you want to appeal if you do, and she will file a notice of

16   appeal.  All you have to do is ask her, and I'm confident that

17   somebody from her office will be able to represent you on

18   appeal if you decide to appeal.  And if not, I'll appoint

19   somebody to represent you.

20          Obviously, the other thing that was asked, two more

21   things, actually.  One is, you can voluntary surrender.  You'll

22   get a notice from the Probation Office or from the Bureau of

23   Prisons, as will Ms. Quint, telling you where and when to

24   appear to begin the service of your sentencing, and you should

25   show up on that day.

```
 1            Is there a recommendation for a place of
 2    incarceration?
 3            MS. QUINT:  I think based on what we talked about, as
 4    close to D.C. as possible and his family.
 5            THE COURT:  Okay, I will recommend to the Bureau of
 6    Prisons that you be incarcerated in a place as close as
 7    possible to the immediate D.C. area so that your family can
 8    visit.
 9            So I wish you good luck, Mr. Armstead.  I know that
10    you are the kind of a person that will have learned a lesson
11    from this, and it may be that you could have learned your
12    lesson without being locked up.  I don't think we will see you
13    in a court again, I don't think we will see you committing a
14    crime again, but given the position you held, the public trust
15    that you had, and the message of deterrence and public respect
16    for the law that I have to send to the community, I think a
17    period of incarceration is appropriate.
18            So that's my sentence.  Good luck to you, sir.
19            THE DEFENDANT:  Thank you.
20            MS. QUINT:  Thank you.
21        (Proceedings concluded.)
22
23
24
25
```

1                            CERTIFICATE

2            I, LINDA L. RUSSO, Official Court Reporter, certify

3    that the foregoing pages are a correct transcript from the

4    record of proceedings in the above-entitled matter.

5

6

7                              _____

8                              Linda L. Russo, RPR
                               Virginia CCR No: 0313102

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25